IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BRIAN MATTHEW CHAVERS,  )
                                         )

    Plaintiff,  )
                                         )

    v.  )    CASE NO. 2:24-cv-467-RAH-SMD
                                         )

WESTROCK SERVICES, LLC,  )
                                         )

    Defendant.  )

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff, Brian Matthew Chavers, a white male, brings this race and gender discrimination action against his former employer, WestRock Services, LLC (WestRock). In his Complaint, Chavers brings disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Title VII), and 42 U.S.C. § 1981. Among others, Chavers claims that WestRock terminated him at least in part because of his race and gender.

Now pending before the Court is WestRock's *Motion for Summary Judgment*. (Doc. 42.) The motion is fully briefed and ripe for review. Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the motion is due to be denied.

### JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). But "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (quotation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

## BACKGROUND

The facts, stated in the light most favorable to Chavers, are as follows:

### Chavers' Employment at WestRock

WestRock is a paper and packaging manufacturer with operating plants around the world. Chavers began working for WestRock's corporate predecessor as

2

a general laborer at its Montgomery, Alabama plant in April 1998. He advanced steadily—machine operator, then process leader, hourly supervisor of the converting department in 2010, and salaried supervisor in 2012, a position he held until his termination.

In 2016, Chavers was suspended for three days after he told another employee, Terry Wooten, that "his operating skills were terrible, and he wasn't ever going to learn until he started listening." (Doc. 44-1 at 15.) As a result, Chavers was also issued a last chance agreement which had a stated purpose of "Respect in the Workplace" and included a statement that "any future incidents will result in further discipline up to and including termination." (Doc. 44-7 at 12.) The last chance agreement did not on its face contain an expiration date, but according to former WestRock Plant Manager, Melvin Yates (white male), the supervisor who implemented this type of disciplinary action, it was typically only expected to last a year. (Doc. 44-11 at 62.) In 2020, Chavers was further issued a "coaching session to make [him] aware of [his] poor email etiquette communication" after sending multiple derogatory emails criticizing WestRock's COVID-19 decisions. (Doc. 44-7 at 13.)

Despite these reprimands, in May 2022, WestRock entrusted Chavers with leader-training duties. As part of this, Chavers was required to work across shifts, train new hires, assist supervisors throughout the plant, and directly supervise between fifteen and eighteen employees. (Doc. 44-1 at 6–8.)

### Lockley is Hired at WestRock

One of the employees Chavers supervised was Terrica Lockley (black female), hired in May 2022. (Doc. 44-5 at 63.) On October 22, 2022, Lockley injured her hand in a print cylinder, was diagnosed with a contusion to her right middle finger, prescribed ibuprofen, and was given a note restricting her from lifting more

than ten pounds. (Doc. 44-10 at 63, 67.) She was granted light-duty work consistent with those restrictions. (Doc. 44-5 at 21.)

Chavers maintains that Lockley abused her restrictions by repeatedly sitting in the breakroom watching TV on her phone when she should have been working. This hurt morale to the point that other employees complained and threatened to quit. (Doc. 44-1 at 21.) When Chavers gave her assignments he believed fell within the scope of her light-duty work restrictions, she refused. (*Id.* at 22.)

Lockley made two complaints to human resources about Chavers. The first, in October 2022, accused him of giving her work instructions she felt were outside her restrictions. In response, plant general manager Kenneth (KJ) Hardman (black male) told Chavers "not to worry about her. Just let the safety manager deal with her," which Chavers understood as an instruction to stop interacting with Lockley altogether. (*Id.*)

### November 30, 2022, Incident

On November 30, 2022, Chavers met with Hardman and Converting Superintendent Matt Jackson (black male) at 5:30 a.m. (Doc. 44-7 at 22.) At the meeting, Chavers asked them why Lockley was sweeping the breakroom when an outside company was already paid to clean the breakroom. (*Id.*) He then asked whether he could instead have her sweep the front aisle of his department before guests arrived at 9:00 a.m. They answered, "As long as you follow her restrictions, she works for you. She does what you tell her to do." (*Id.* at 25.)

Chavers instructed Lockley to sweep the aisle around 6:00 a.m.—a task that, in his estimation, would take approximately twenty minutes. (*Id.* at 23.) Instead, Lockley stayed in the breakroom and said she would get to it. (*Id.* at 22; doc. 44-7 at 22.) He found her still there—shoes off, sipping water—at 6:45 a.m. and again at 7:20 a.m., repeating the instruction each time and asking another employee, Ametris Yelder (black female), to page him if Lockley remained in the breakroom. (Doc. 44-

7 at 22–23.) When Chavers found her there a fourth time at 8:00 a.m., he confirmed with Hardman that Lockley's restrictions did not include extra break time. He then told Lockley that if she would not do the task she should say so, and that WestRock did not pay her to sit in the breakroom. (Doc. 44-1 at 26.)

Chavers then reported Lockley's insubordination to Regional Manufacturing Manager Ryan Cutright (white male), who told him to call Shalita Lee (black female) in human resources and "write her ass up for performance." (*Id.* at 24.) But before Chavers could do so, Lockley called Lee and filed a second harassment complaint against Chavers. Summoned to Hardman's office, Chavers explained the situation to Lee by phone, protesting that he was "not a babysitter" but a production supervisor. Lee directed that Lockley would thereafter report to Jackson and that Chavers should avoid her. (*Id.* at 24–25.)

### Chavers' Termination

On December 12, 2022, Chavers was called into a meeting with Hardman and Jackson and connected by phone to Lee, who told him that, following an internal investigation, WestRock had decided to terminate him for harassment and the prior 2016 incident. (*Id.* at 26–27.) Lee coded the termination as gross misconduct, which barred Chavers from rehire. (Doc. 44-4 at 71.) The next day, Ramona Segler (white female), the head of HR for Chavers' unit, told him she had not been part of the decision but would speak with Hardman and follow up. She never did. (Doc. 44-1 at 30–31.)

### Lawsuit

Chavers filed his EEOC charge in March 2023, alleging he experienced unlawful race and gender discrimination at WestRock. (Doc. 1-1 at 1–4.) The EEOC issued Chavers a right to sue letter on May 22, 2024. (Doc. 1-2 at 1.)

Chavers timely filed suit on August 5, 2024, against WestRock. (Doc. 1.) In his Complaint, Chavers brings the following claims:

5

- Count I—Race Discrimination in violation of Title VII;
- Count II—Sex Discrimination in violation of Title VII; and,
- Count III—Race Discrimination in violation of 42 U.S.C. § 1981.

## DISCUSSION

The Court will first address Chavers' Title VII race and sex discrimination claims and then address Chavers' § 1981 race discrimination claim.

### Title VII Race and Sex Discrimination Claims

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Discrimination claims brought under Title VII may be pursued under a 'single-motive' theory — in which the employee alleges that unlawful bias was 'the true reason' for an adverse employment action." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). Or a plaintiff may employ "a 'mixed-motive' theory — in which [the employee] alleges that bias was simply 'a motivating factor' for the adverse action, 'even though other factors also motivated the practice.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)).

Chavers proceeds under a mixed-motive theory of discrimination for his Title VII claims. "To avoid summary judgment, a plaintiff raising a mixed-motive claim must offer 'evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [him]; and (2) a protected characteristic was *a* motivating factor for the [employer]'s adverse employment action.'" *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016)). Because he proceeds under a mixed-motive theory, Chavers is not required to satisfy the *McDonnell Douglas* burden-shifting framework. *See Quigg*, 814 F.3d at 1238 ("In light of this clear incongruity between the *McDonnell Douglas* framework and

6

mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment.").

Although mixed-motive theories of discrimination allow a "lessened standard of causation," the standard of proof is not lessened. *McCreight v. AuburnBank*, 117 F.4th 1322, 1333 (11th Cir. 2024). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents sufficient evidence that would allow a reasonable jury to infer intentional discrimination by the decisionmaker. *Id.* No matter which theory the plaintiff relies on, "bits and pieces" of evidence are insufficient to survive summary judgment. *Id.*

To begin, Chavers' termination was obviously an adverse employment action. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (noting that adverse employment actions include "ultimate employment decisions . . . such as termination, failure to hire, or demotion" (quotation omitted)). Thus, the only dispute on the Title VII claims is whether Chavers' race and gender were motivating factors in his termination.

WestRock's motion is directed almost entirely to the *McDonnell Douglas* burden-shifting framework, contending that Chavers cannot make out a prima facie case of discrimination because he was not qualified for his position and has identified no similarly situated comparator outside his protected classes. That framework does not govern Chavers' Title VII claims at this stage. A plaintiff proceeding under a mixed-motive theory need not utilize the *McDonnell Douglas* framework to survive a motion for summary judgment. *See Quigg*, 814 F.3d at 1239.

In any event, WestRock's qualification argument would not succeed even on its own terms. WestRock alleges that Chavers was unqualified because he was discharged for violating the Mutual Respect in the Workplace policy and the terms of his last chance agreement. It also claims that before Chavers' termination, multiple employees had complained about his harsh management style. (Doc. 44-2

7

at 17–18.) In other words, WestRock argues that Chavers' alleged behavior renders him unqualified for the position.

WestRock's reasoning conflates the qualification element with the proffered reason for the adverse action. An employee is qualified for a position if he meets the criteria that the employer articulated for the position. *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n.16 (11th Cir. 1999). A plaintiff's qualification is assessed independently of the misconduct the employer offers to justify the termination, and where an employee has held a position for a significant period, qualification may be inferred from his tenure. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). Chavers was a supervisor at the Montgomery plant for more than a decade and was entrusted with plant-wide leader-training responsibilities only months before his discharge. On this record, his qualification for the position is not genuinely in dispute.

While a majority of WestRock's motion argues for summary judgment under the *McDonnell Douglas* test, under a mixed motive theory, "a plaintiff need only show that a protected consideration contributed in some way to the outcome—even if it ultimately changed nothing." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1339 (11th Cir. 2023). An employee can succeed under a mixed-motive theory by presenting evidence that discriminatory input factored into the decisional process that resulted in the adverse employment action. *Quigg*, 814 F.3d at 1241. A "plaintiff will always survive summary judgment if [he] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* at 1240 (quotation omitted).

WestRock argues that Chavers was terminated for a legitimate nondiscriminatory reason: workplace misconduct stemming from the 2016 last chance agreement. Chavers argues that this is pretext for the real reason for his

termination: WestRock's "deliberate, company-sanctioned campaign to purge older white males from its workforce in order to accomplish the goal of increasing the percentages of women and persons of color." (Doc. 48 at 4.)

### 1. Corporate Campaign Targeting White Male Employees

Chavers has presented evidence of animus towards white male employees by corporate leadership at WestRock. To begin, Chavers cites a statement made by Senior Vice President of WestRock Ken Seymour at a 2015 national sales meeting in which he said, "we have too many old white males in this industry, and we're going to be doing some changes." (Doc. 49-1 at 62.) This statement was made, without correction or clarification, while WestRock's president was in attendance. (*Id.*) While a statement such as this would not constitute direct evidence of discrimination and would not be enough standing alone to show a discriminatory motive, "potentially discriminatory comments that [are] not directly related to the employment decision could contribute to a circumstantial showing of discriminatory intent." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (per curiam) (citing *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998)).

This is especially true when considering the additional evidence Chavers has presented, which infers that this statement of policy continued into the future and became official policy. For example, WestRock's 2021 Annual Report states that the company had implemented a multi-year diversity, equity, inclusion, and belonging policy (DEI), including a four-year goal for gender and ethnic representation as well as evidence that high-ranking executives' compensation were tied to these goals. (Doc. 44-8 at 25–27.) According to Chavers, these goals led to real change. WestRock's 2021–2022 Sustainability Report showed that, company-wide, the number of male and white employees decreased while the number of women and persons of color simultaneously increased. (Doc. 44-9 at 70.) This pattern was true for the Montgomery plant as well. In addition to Chavers, three

other white managers were terminated at approximately the same time. (Doc. 44-2 at 38-39.) Yet the number of African American managers remained the same. (*Id.* at 38.) WestRock largely dismisses these attacks as speculative, conclusory, and based on personal opinions rather than facts. (Doc. 43 at 27–28.)

It is true that "[s]tatistics that merely describe the[] employees as minority or non-minority and disclose whether they were fired or disciplined less severely proves nothing without more information about the particular circumstances involved in each situation." *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1325 (11th Cir. 2006). That said, these statistics are backed by testimony from a former high-ranking official at WestRock's Montgomery plant. Former General Area Manager, Joe Rogers (white male), testified that after WestRock hired Melaynie Perkins as vice president, WestRock implemented a strict DEI policy that treated older white males more harshly for workplace misconduct and targeted them for termination. (Doc. 44-11 at 16.) He testified that Perkins "did not follow any familiar protocol with respect to the termination of employees and quickly got to work removing people." (*Id.*) He believed that Perkins targeted employees for termination who did not fit within the racial and gender goals of the DEI policy. (*Id.*) Despite WestRock denying these allegations, "[w]here a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012).

Additionally, former plant manager Melvin Yates informed Chavers of a conversation he had with Hardman about Charvers' termination. Hardman allegedly told Yates, in regard to Chavers' termination, that "[i]t ain't right, but [it] is what we're having to do." Hardman also told him that Lee said, "not to be in the way of change in Montgomery" when Hardman questioned the decision to fire Chavers. (Doc. 44-1 at 27.) Presented against the rest of the evidence, this arguably is

confirmation from the ultimate decisionmaker in Chavers' termination that Chavers was fired at least in part because of his race and gender.

WestRock urges the Court to disregard the "change in Montgomery" statement as inadmissible hearsay and argues that Chavers, who was not present for the underlying conversation, cannot supply its meaning. Neither objection justifies setting aside the statement at summary judgment. A court may consider an out-of-court statement in ruling on summary judgment so long as it "could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). Lee and Hardman were WestRock employees speaking within the scope of their employment about the decision to terminate Chavers, so their statements are not hearsay but admissions of a party opponent. Fed. R. Evid. 801(d)(2)(D). Its meaning, whether "change" referred to the racial and gender composition of the plant's leadership or to something more innocent, is for the jury, not the Court, to resolve. *See Alphin v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012).

### 2. Better Treatment of Minority Employees

Chavers has also presented evidence that he claims proves systematically better treatment of minority employees. While this is not a requirement in the mixed-motive context, *see Quigg*, 814 F.3d at 1237–40 (rejecting the *McDonnell Douglas* framework in the context of mixed-motive claims), it is relevant to mixed-motive theories because comparator evidence is just one way of showing discrimination under any causation standard. *See Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019) (noting that discrimination is a "comparative concept" by "its very nature.").

Chavers provides several examples. First, Chavers points to Jeff Smith (black male), a supervisor at the Montgomery plant, who had received multiple disciplinary

actions and two suspensions without being fired. (Doc. 44-1 at 29; doc. 49-3; doc. 49-4; doc. 49-5; doc. 49-6.) Smith was only terminated after a lockout safety violation in 2026. (Doc. 44-3 at 24.) Second, he points to Lockley, who he claims violated safety rules, abandoned her workstation, refused direct orders, argued with supervisors, and avoided work without being fired. (Doc. 44-1 at 25; doc. 44-10 at 18–24, 44–45.) She was only terminated due to a reduction-in-force and not the result of workplace misconduct. (Doc. 44-4 at 45.) Lastly, Chavers points to Superintendent Jackson, who failed to meet the requirements of a six-month final warning performance improvement plan (PIP). (Doc. 49-7.) The delineated consequence for failing to meet the terms of his PIP was termination. Yet, rather than being terminated, WestRock merely extended the six-month period until his weekly goals were met. (Doc. 44-3 at 7–8.) This was after Jackson had already previously been issued a performance enhancement plan and a written documented action. (Doc. 49-8; doc. 49-9.)

WestRock argues that the three black workers Chavers mentions—Smith, Lockley, and Jackson—were not similarly situated comparators and are therefore irrelevant. (Doc. 50 at 3–4.) But even if Chavers' comparators are not similarly situated, "[t]he requirement that comparators be similarly situated in all material respects, only applies at step one of the *McDonnell Douglas* framework," it does not limit the evidence a jury may weigh in answering the ultimate question of discriminatory intent. *Johnson v. Mia.-Dade County*, 169 F.4th 1301, 1310 (11th Cir. 2026) (quotation omitted). Because Chavers proceeds on a mixed-motive theory, that ultimate question is whether a protected characteristic was a motivating factor in his discharge, and the differences WestRock identifies between Chavers and Smith, Lockley, and Jackson go to the weight a jury should assign to the comparator evidence, not to whether the jury may consider it. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023).

Here, Chavers has presented evidence that multiple minority workers were given numerous chances before disciplinary action was taken against them, if at all. This is in contrast to Chavers, who was allegedly terminated based in part on a last chance agreement from six years earlier. A reasonable jury could find it probative that WestRock repeatedly extended leniency to these employees for serious or recurring infractions while invoking a six-year-old last chance agreement to discharge Chavers for a single, disputed exchange. Accordingly, Chavers has presented evidence that minority workers were treated more favorably when it came to disciplinary decisions, and it is relevant and probative of WestRock's discriminatory intent.

### 3. WestRock's Deviation From Company Policy

Lastly, Chavers has presented evidence that WestRock did not follow its own written policies when it cited Chavers's 2016 last chance agreement and their faulty investigation as a basis for terminating him. "Standing alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) (citation omitted). However, "[d]epartures from normal procedures may be suggestive of discrimination." *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.").

As it relates to the last chance agreement, WestRock has no written policy or training materials that describe this type of disciplinary action. (Doc. 44-4 at 43.) The only forms of discipline recognized by WestRock were verbal warnings, written warnings, suspension, and termination. (*Id.* at 29–30.) WestRock argues that even though there was not a written policy about last chance agreements, it was a known practice in the company and Chavers understood its consequences. (Doc. 50 at 9.) However, assuming that last chance agreements were a known form of punishment

13

at WestRock, there was also company policy that each level of discipline had a standard expiration timeline. (Doc. 44-4 at 41–42.) For last chance agreements, that timeline was usually one year. (Doc. 44-11 at 62.)

Chavers also points to the faulty investigation and decision-making process. Despite Hardman being the final decisionmaker, he conducted no independent investigation and said the decision was "out of his hands." (*Id.* at 63.) Segler, the head of Human Resources, also said that she was not part of the investigation and the decision had already been made when the paperwork reached her desk. (Doc. 44-1 at 30.) Rogers, the business unit general manager and supervisor to Hardman, testified that despite always being a part of HR investigations, he was not involved or even aware of the investigation into Chavers. (Doc. 44-11 at 15–16.)

Lastly, WestRock's attempt to paint Chavers as a problem employee is contradicted by the record. Chavers' performance evaluations from 2019 to 2022 show no documented behavioral issues. (*Id.* at 70–85.) He was promoted several times during his tenure with WestRock, and in 2022, he was entrusted with leader-training responsibilities. (Doc. 44-1 at 8.) Hardman, his direct supervisor, even testified that he would not have promoted Chavers to this position if he was a problem employee. (Doc. 44-2 at 36.) And as it concerns the last chance agreement, the plant manager who issued it to Chavers, Melvin Yates, later testified that he regretted it, it should have been removed from his file, and that Chavers "was the one person [he] could consistently rely on to get the job done." (Doc. 44-11 at 61–62.) All of this contradicts WestRock's accusations that Chavers was a problem employee.

WestRock responds that this is a quarrel with its business judgment rather than evidence of discrimination. It is true that the Court does not sit as a "super-personnel department" reexamining the wisdom of an employer's decisions. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). And an employer is generally

14

entitled to act on an honest belief that an employee violated its policies, even if that belief later proves mistaken. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). But the honest-belief rule presumes a belief grounded in some inquiry into the facts.

Here, the supposed final decisionmaker, Hardman, conducted no independent investigation, could not say what Chavers actually said or which words he supposedly used, and described the decision as "out of his hands," while the regional HR manager and the area manager above him disclaimed any role in or knowledge of the investigation. Coupled with the positive performance record that preceded the discharge, this evidence would permit a reasonable jury to find that WestRock's stated reason was not an honestly held belief but a rationale assembled after the decision had already been made on a discriminatory basis. That is not second-guessing the soundness of a personnel decision; it is testing whether the proffered reason is the true one—the inquiry the pretext analysis requires. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

Chavers has presented evidence of discriminatory comments made by a high-ranking official in the company as well as an individual directly involved in the termination decision, a corporate DEI program backed by statistical evidence and testimony of a former general manager, terminations of other white male managers at approximately the same time period, employees outside of Chavers' protected class who were treated more favorably for misconduct, and evidence that WestRock deviated from standard company policy in its decision to terminate his employment. While WestRock argues that all of this is better categorized as an attack on the business judgment of the company rather than evidence of discrimination, the Court cannot conclude that there are no disputed factual issues and that WestRock is entitled to judgment as a matter of law on Chavers' race and gender based mixed-motive claims. Therefore, WestRock's motion is denied as to those claims.

### Race Discrimination Under 42 U.S.C. § 1981

Like Title VII, § 1981 "protects against employment discrimination on the basis of race." *Addison v. Ingles Mkts., Inc.*, 515 F. App'x 840, 841 (11th Cir. 2013) (per curiam). Unlike Title VII, Section 1981 claims must be pursued under the single-motive theory only. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 328 (2020).

To survive a motion for summary judgment, a plaintiff asserting unlawful discrimination in violation of § 1981 "must present sufficient facts to permit a jury to rule in her favor." *Lewis*, 918 F.3d at 1220. A plaintiff may satisfy his burden in three ways: (1) "present[ing] direct evidence of discriminatory intent," (2) "satisfying the burden-shifting framework set out in *McDonnell Douglas*," or (3) "demonstrate[ing] a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220 n.6.

Here, Chavers opposes summary judgment by relying on the convincing mosaic standard. (Doc. 48 at 24.) "[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework." *Berry*, 84 F.4th at 1311 (citation omitted). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 946. "The convincing mosaic approach is—in its entirety—the summary judgment standard." *McCreight*, 117 F.4th at 1335.

In proving a convincing mosaic, a plaintiff "may point to any relevant and admissible evidence." *Tynes*, 88 F.4th at 946 n.2. Evidence that is likely to be probative is "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may

be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)).

Chavers relies on the same evidence supporting his Title VII race and gender discrimination claims to support his 42 U.S.C. § 1981 race discrimination claim.

Because § 1981 permits only a single-motive theory, Chavers must ultimately prove that race was a but-for cause of his termination, not merely a motivating factor. *Comcast Corp.*, 589 U.S. at 333. That more demanding causation standard does not change the analysis here. The same body of evidence that creates a triable issue on the motivating-factor analysis—ambiguous comments, a documented corporate emphasis on altering the racial composition of the workforce, materially more lenient discipline of minority employees, and departures from WestRock's ordinary process—would also allow a reasonable jury to find that Chavers would not have been discharged but for his race. The evidence therefore satisfies § 1981's causation standard for the same reasons it satisfies Title VII's.

First, Chavers has presented evidence of a potentially discriminatory comments made by a high-ranking corporate officer as well as the ultimate decisionmaker in his termination. Chavers also presented evidence that WestRock implemented a strict DEI policy and supported this with statistics both company wide and Montgomery specific showing that the number of white male employees was decreasing while the number of female and minority employees was increasing. This was corroborated by the testimony of a former General Area Manager of WestRock.

Second, Chavers has presented evidence of systematically better treatment of similarly situated employees. Importantly, under a convincing mosaic theory, the plaintiff "do[es] not [have to] meet [the Eleventh] Circuit's strict definition of similarly situated comparators." *Lewis v. City of Union City*, 934 F.3d 1169, 1187 (11th Cir. 2019). Even where the comparator has different conditions, is disciplined

17

years apart, and has been subject to different personnel policies, a reasonable jury could find the better treatment of a similar employee not irrelevant. *See, e.g.*, *Mercer v. Ala. Dep't of Transp.*, No. 20-13722, 2022 WL 3910604, at *5 (11th Cir. Aug. 31, 2022). Despite Smith, Lockley, and Jackson not being identical to Chavers, their better treatment is not irrelevant for the purposes of the "convincing mosaic" analysis and also provides evidence of discriminatory intent.

Lastly, Chavers has shown evidence of pretext. In the convincing mosaic analysis, "[a] plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis*, 934 F.3d at 1186.

Here, Chavers has provided evidence casting doubt on WestRock's proffered reason for his termination as well as evidence that WestRock failed to follow formal policy. Chavers was praised by his supervisors, consistently received positive performance evaluations, and was even given leadership responsibilities in 2022. Chavers further established that there was no written policy acknowledging or describing a last chance agreement and that even if it was a recognized form of discipline, it was intended to have an expiration date of one year. Moreover, the manager who issued the last chance agreement testified that it was a mistake and should have been taken off his record. Lastly, Chavers presented evidence that key supervisors such as Hardman, Segler, and Rogers either had no say in his termination decision or were never made aware of the investigation in the first place. Rogers even testified that Perkins, the vice president at the time, did not follow familiar protocol with respect to terminations and quickly began removing people based on their race and gender. (Doc. 44-11 at 15–16.)

In sum, Chavers has presented enough evidence to allow a jury to find discriminatory intent in WestRock's termination decision. Accordingly, WestRock's motion is denied as to Chavers' § 1981 claim.

## CONCLUSION

After considering the evidence in the light most favorable to Chavers, WestRock has not shown its entitlement to summary judgment as to Chavers' race and gender discrimination claims under Title VII or his race discrimination claim under 42 U.S.C. § 1981. Accordingly, it is **ORDERED** that Defendant's Motion For Summary Judgment (doc. 42) is **DENIED**.

**DONE** and **ORDERED** on this the 9th day of July, 2026.

R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE

19